OPINION OF THE COURT
Philip S. Straniere, J.
Claimants, Nancy A. Bonior and Stephen Foust, commenced this small claims action against the defendants, Citibank, N.A., United Land Services Corp., and Municipal Credit Union (MCU) alleging that defendants wrongfully collected from the claimants an early closure fee when claimants refinanced their home equity line of credit. A trial was held on September 21, 2006. The caption was amended to add Stephen Foust as a claimant and to have the correct corporate name for all of the defendants. Claimants appeared without counsel. Each defendant was represented by an attorney.
Background
Claimants are the owners of the premises 123 St. Marks Place, Staten Island, New York. On October 18, 2005, they attended a home equity line of credit loan closing at a branch of defendant Citibank. The loan was secured by a mortgage on 123 St. Marks Place. Defendant United provided a person at the closing to take signatures and notarize documents. No persons other than the claimants, without counsel, and the representative of United, who was not an attorney, attended the closing. The greatest part of the proceeds from the Citibank loan was to be used to satisfy an existing home equity line of credit loan the claimants had with defendant MCU. The claimants’ current home equity line of credit was issued by MCU on August 20, 2004 and was secured by a mortgage on 123 St. Marks Place. The documents from that closing showed a prior mortgage with *773 MCU dated July 10, 2002 in the amount of $130,000 which had been recorded with the Richmond County Clerk on September 5, 2002. Although the July 2002 mortgage was designated as a superior lien to the 2004 loan, the testimony was that the 2002 mortgage loan was satisfied at the August 20, 2004 MCU closing.
A home equity line of credit is a loan secured by a mortgage on the borrower’s property that allows the borrower to draw down money up to a certain maximum amount. Some loans have a fixed rate of interest while others have an interest rate that fluctuates tied to a specific financial index. The parties agree that the claimants’ 2004 loan with MCU had an adjustable interest rate. One of the motivations for the claimants to refinance the loan was that the Citibank home equity line of credit was at a fixed rate so that the claimants would save money each month on their payments because the MCU loan rate at that time was fluctuating upward.
A condition of the Citibank loan was that the MCU mortgage had to be satisfied. On October 7, 2005, MCU issued a letter to the claimants notifying them that as of October 14, 2005, the principal and interest on the home equity line of credit was $177,814.67. The letter informed the claimants that the per diem interest rate was $30.12 and that the credit line was not “frozen” so that additional advances might be added into the amount due MCU. In bold capitalized type the letter further advises to “PLEASE CALL OUR MORTGAGE SERVICING AREA ... TO VERIFY ALL PAYOFF AMOUNTS.”
Included in the projected total payoff amount was an additional $5,390 designated as “reimbursement of closing costs.” The letter notified the claimants in bold capitalized type that “A SEPARATE CHECK MUST BE REMITTED FOR REIMBURSEMENT OF CLOSING COSTS.” The total due and owing as of October 14, 2005 was $183,204.67.
Submitted as an exhibit by United is a “payoff calculation” sheet. This document took the MCU figure and added 18 days of per diem interest. United directed that a check be issued in the amount of $183,746.83 which covered all sums due until November 1, 2005. In fact on October 24, 2005, United issued a check drawn on its “settlement account” to MCU in the amount of $183,746.83. In spite of the fact that the MCU letter required separate checks for the payoff and closing cost reimbursement, United ignored this instruction and improperly issued only one check ostensibly for payment of both items.
*774 Claimants are alleging that they were unaware that they had to repay MCU closing costs from the August 2004 transaction. They contend that at the Citibank closing the payoff amount was changed on the Citibank check issuance memorandum from $183,746.83 to $177,554 and that they initialed it. The claimants deny changing the amount as does the representative of United who also was present. There is no explanation as to the source of the $177,554 figure since it is less than the amount MCU claims was due for the loan payoff.
The defendants allege that no matter what errors occurred at the closing or what misunderstandings the claimants had about the payoff amount, the claimants had the opportunity to rescind the transaction since they were provided with a “Notice of Right to Cancel” by Citibank. This document informed the claimants as borrowers that they had until midnight October 21, 2005 to cancel this transaction. The claimants did not utilize this right and allowed the transaction to go forward.
Observation
Apparently someone has taken the advice of Dick the butcher in Shakespeare’s Henry VI, part 2 and “kill[ed] all the lawyers.”[1] Nowhere in this transaction does there appear to be the participation of any lawyers. No attorney represented the claimants as borrowers. No attorney represented the lender Citibank. No attorney represented the settlement agent United. No attorney represented the prior lender MCU. The only persons present were the borrowers and a representative of United whose function was to take signatures and collect the documents. At one time a real estate transaction consisted of a deed, a note and a mortgage, took about 15 minutes to complete, and had the participation of an attorney for all parties to the transaction. The last time the court checked, we were still in the city of New York where people do not even verify the score of the Yankees game without consulting counsel, and yet, lawyers have effectively been eliminated from real estate closings involving the refinance of mortgages and secondary loans, including home equity lines of credit. One could conclude therefore that these transactions have no legal implications. That, however, would be far from the truth. The borrowing of money secured by a mortgage is often a complex transaction with serious legal implications for all of the parties involved, especially the borrowers who are pledging their home as security.
*775 An analysis of this transaction will lead to the conclusion that, like the adage “always put everything in writing except those things that you shouldn’t put in writing,” and its corollary “never put anything in writing except the things that you should put in writing,” “you don’t need a lawyer for this type of transaction unless of course you need a lawyer,” appears to be the new mantra of the mortgage industry as out-of-state lenders attempt to impose the rules of escrow closings on the New York market. In Frank Loesser’s “Guys and Dolls” Nathan Detroit advised Big Jule that “you cannot interpolate Chicago dice into a New York crap game.” As more and more interstate lenders enter the New York market, it appears consumers here may be playing with Big Jule’s “spotless dice.”
For some inexplicable reason, a myth has been created around . the mortgage refinance-second mortgage industry that borrowers do not need lawyers at these transactions. The industry seems to be content to paraphrase Gold Hat, one of the bandits in the film “The Treasure of the Sierra Madre,” who in the current situation might say “Lawyers!? We ain’t got no lawyers. We don’t need no lawyers! I don’t have to show you any stinking lawyers!”[2] The court cannot conclude that lenders are actively discouraging borrowers from being represented by counsel, but the sheer number of these transactions taking place without lawyers leads to the reasonable conclusion that borrowers are not being encouraged or advised to have representation at the closing. The response that the borrower is voluntarily not retaining counsel and has the three-day right-of-rescission period to have the documents reviewed by an attorney does not correct the attitude and unspoken policy that pervades the industry. The experience of the court in litigation similar to this is that borrowers are led to believe by lenders that both home equity line of credit loans and refinancing an existing mortgage are relatively simple transactions and that most persons do not retain counsel. The court agrees that generally these are not complicated proceedings, but each piece of real estate is unique and only a trained professional, such as an attorney, can spot potential legal problems that might adversely affect the rights of the borrower or detect errors that need to be corrected immediately to avoid corrective ministerial postclosing activities.
The court will set forth below several “problems” with this closing that might have been remedied by the active *776 participation of legal counsel for the borrowers, as well as for the other participants.
Legal Issues Presented
A. Defendant MCU
Defendant MCU contends that the monies collected at the closing, $5,390, were for reimbursement of closing costs incurred when the claimants previously borrowed $185,000 from MCU on August 20, 2004. That loan too was secured by a home equity mortgage on claimants’ residence. MCU is relying on paragraphs in two of the agreements the borrowers signed at that closing to justify its collecting the $5,390 when the credit line was paid off by Citibank in October 2005.
Paragraph 27 of the home equity mortgage document signed by the claimants in August 2004 provides:
“EARLY CLOSURE FEE.”
“If during the first thirty-six (36) months of the Account, the Mortgagors request the Credit Union to close the line of credit or take any other action that results in the release of this Mortgage, or the Credit Union terminates the line of credit as a result of a default by the Mortgagors, the Mortgagors will be required to reimburse the Credit Union for the fees the Credit Union has paid on the Mortgagor’s behalf at closing. The amount of these fees will be added to the amount due under the Obligation. The Credit Union will not discharge this Mortgage unless the Mortgagors repay these amounts and all other amounts due under the Obligation.”
At the same time the home equity mortgage was executed, the borrowers signed another document entitled “Municipal Credit Union Home Equity Account Obligation.” Paragraph 11 of this document is labeled “Early Closure Fee” and provides:
“If during the first thirty-six (36) months of your account, you request us to close your Home Equity Account or take any other action that results in a release of the mortgage, or we terminate your line of credit as a result of a default by you, you will be required to reimburse us for the fees that we have paid on your behalf at closing. The amount of these fees will be added to the amount due under this Obligation. We will not discharge the mortgage you granted to us unless you repay these amounts and all other amounts due under this Obligation.”
*777 An examination of these two documents reveals the mortgage contains the following language: “PREPAYMENT 24. The Mortgagors may prepay all or part of the outstanding balance of the Obligation at any time without penalty” while the account obligation provides: “22. Prepayment. You may prepay all or part of the outstanding principal balance of this Obligation at any time without prepayment charge.”
MCU argues that the reimbursement of closing costs is not a prepayment penalty. MCU in 2004, and Citibank in 2005, as do many lenders, advertise that there will be “no closing costs” on home equity loan transactions. The principal cost that is being absorbed by the lender which would be the borrowers’ obligation is the borrowers’ share of the New York state and city mortgage tax. The 36-month period for a borrower keeping a line of credit open appears to be relatively uniform in the New York City area. MCU’s witness testified that the lenders have made a business decision that on the average they recover these closing costs from the borrower by the mortgagor keeping the loan active for three years.
“What’s in a name? That which we call a rose by any other name would smell as sweet.”[3] Following Shakespeare’s observation, the court cannot agree with MCU that because this is labeled an “early closure fee” the charge is not a prepayment penalty. The truth is the borrower is paying money to the lender as a condition of prepaying the loan. Had the lender collected the closing costs, held the money in escrow and then refunded it to the borrower if and when the line of credit remained open for at least 36 months, it would not be a prepayment penalty. MCU charged the borrower for paying off the loan and closing the credit line early. The fact that it was to reimburse the lender for closing costs it had underwritten does not change the nature of the payment. Some people may call a camel a “horse built by a committee,” but genetically it is still a camel and not an equine.
Further examining the MCU position, if this is a reimbursement of expenses that the lender on the average recovers from a borrower who utilizes the credit fine for at least three years and not a penalty, then why is not the repayment charge prorated over the 36-month period? In other words, if the line is paid off after 12 months, the reimbursement would be two thirds of the closing costs, and after 24 months one third of the closing costs. If the 36-month period is in fact not related to the time the *778 lender needs to recover the closing costs, then the 36-month period is an arbitrary interval unrelated to the recovery of the lender’s costs and its recovery purely a prepayment penalty.
Taking MCU at its word that this is a reimbursement recovered if the line is open for 36 months means that since the borrowers paid the line off in October 2005, 14 months after opening the line with MCU, MCU would only be entitled to twenty-two thirty-sixths of the closing costs and not the entire amount.
It can also be argued that since there was a prior home equity line of credit in 2002 and all that the borrowers did was increase the amount of the loan, the 36 months should run from July 2002. If that is the case, then MCU was paid off more than 36 months after the initial loan when the claimants refinanced in October 2005. It should be pointed out that there is no evidence as to whether the 2002 loan was a “no closing cost” loan. Nor is there evidence that MCU sought to be reimbursed in 2004 when the credit line was increased.
MCU claims that it is owed $5,390 for the closing costs incurred at the August 2004 closing. The “closing report” prepared by the “Closer: Settlement Corp.” (apparently not an attorney) lists expenses that only total $5,140 and not $5,390. Typed at the bottom of the closing statement is a notation that $250 was a “settlement fee.” To whom was it payable? For what services rendered? None of this information has been provided by MCU to justify collecting the alleged reimbursement.
Examination of the $5,390 bill reveals several other questionable entries. New York State Tax Law § 253 imposes a mortgage recording tax on both the borrower (mortgagor) and the lender (mortgagee). The lender’s portion is 0.25% of the loan amount and. “shall not be paid or payable, directly or indirectly, by the mortgagor” (Tax Law § 253 [1-a] [a]). Since the statute prevents the borrower from paying this portion of the tax, MCU cannot recover this money as part of its reimbursement. Perhaps an attorney would have questioned MCU about this amount. But a home equity line of credit is a simple transaction and you do not need the expertise of any attorney.
There are other charges on the invoice from “Settlement Corp.,” MCU’s settlement agent at the closing, that do not pass even the minimum amount of scrutiny. Had the claimants had an attorney present at that transaction in 2004 these costs would undoubtedly have been questioned and either reduced or *779 eliminated. The first item is a $582 fee for mortgage title insurance. This is a title policy to insure the lender only and is a standard charge for such transactions. However, did the claimants receive the “re-issue” rate that is available from title companies to borrowers who have previously purchased title insurance for the subject property? Since the claimants had at the time of the August 2004 closing a prior home equity loan mortgage from MCU issued in July 2002 in the amount of $130,000, the court must question why they were charged a premium on the $185,000 and not just on the additional monies since MCU was already insured by the title insurance company and only the potential extent of MCU’s exposure was being increased. An attorney would have questioned this charge from MCU. But a home equity line of credit loan is a simple transaction and you do not need the expertise of an attorney.
The existence of the prior MCU home equity line of credit also calls into question whether or not MCU offered the borrowers to consolidate, extend and modify the existing mortgage and thereby only pay a mortgage tax on the new monies issued and not the original $130,000. Again, had the claimants had an attorney they might have at least inquired about the availability of this mortgage product. But a home equity line of credit loan is a simple transaction and you do not need the expertise of an attorney.
MCU is also seeking to be reimbursed for the recording fees paid at the August 2004 closing. The closing statement lists the charges as $182 for the mortgage and $80 for the satisfaction. Considering the recording charge in Richmond County is $30 for each document and $2 a page, Settlement Corp. is representing it recorded a 76-page mortgage, a document only slightly shorter than Tolstoy’s “War and Peace.” The excessive nature of this charge is confirmed by the fact that the duplicate copy of that mortgage given to claimants by MCU and placed in evidence by MCU is only six pages long. It would require only $42 to record. The satisfaction of mortgage which is generally only two pages long apparently was 25 pages long in this instance. Perhaps an attorney would have questioned these costs? The questionable nature of these recording charges is verified by the fact that in October 2005, United only charged a total of $67 for recording Citibank’s documents. This must only be the charge for the mortgage since it is too low a charge for a mortgage and a satisfaction with an initial document charge of $30. This leads to the question, was a satisfaction of the MCU mortgage ever is *780 sued and recorded? But a home equity line of credit loan is a simple transaction and you do not need the expertise of an attorney.
MCU is seeking to be reimbursed for “departmentals.” These are fees incurred by title companies in searching municipal records for liens and violations of record that might become liens. As municipal liens, they could have priority over a mortgage. The court is not questioning the need for these searches, only the charge of $375 assessed in this regard. This charge too appears excessive and outside the range charged in Richmond County for similar searches. The claimants were also separately charged for a bankruptcy search and a certificate of occupancy search. At the closing in 2005, Citibank and United did not even bother to conduct these searches. In light of the fact that the claimants in 2004 had an existing home equity mortgage from 2002 with MCU, the need for these searches and the related charges must also be questioned. But a home equity line of credit loan is a simple transaction and you do not need the expertise of an attorney.
Claimants are entitled to a refund of $5,390 from defendant MCU. MCU was not entitled to have the money refunded. The “early closure fee” is a prepayment penalty. The mortgage and home equity account agreement both prohibit prepayment penalties. The name given to the clause does not control. The effect it has is what is determinative. In addition, MCU drafted the documents. Any ambiguities in the documents must be presumed against the drafter, MCU.
The award in claimants’ favor will be entered as two separate judgments, one for $462.50, the lender’s amount of the mortgage tax which the lender is prohibited by statute from collecting, and the second for $4,927.50, the balance of the money collected which was a prepayment penalty prohibited by the loan documents. These are independent judgments below the $5,000 jurisdictional limit of the Small Claims Court.
B. Defendant Citibank
A review of the evidence and the testimony leads to the conclusion that Citibank is not liable for the return of the $5,390 to the claimants. Citibank complied with applicable federal law and provided the claimants with the notice of right to cancel, giving the claimants the opportunity to review the transaction and cancel it if they chose to do so. The closing documents from Citibank notified the claimants that all payoff amounts would include the charges requested for payoff by the current lender *781 and would include principal, per diem interest and prepayment penalties. The payoff authorization signed by the claimants notified them “lien payoffs would be verified at the time the loan is funded so the actual payoff amount may be higher or lower than the amount shown below.” The fact that the claimants or someone else present at the closing changed the amount due MCU does not alter the fact that Citibank was obligated to pay the amount claimed due by MCU. If the claimants disputed that amount, they had the obligation to resolve the dispute with MCU prior to the checks being issued, something they admittedly did not do. Citibank had no obligation to negotiate that amount on behalf of the claimants.
On the other hand, if the claimants were represented by counsel, it is unlikely that the parties would have left the closing table without having the issue resolved. In normal circumstances, counsel would have either contacted MCU at the closing or had the title closer make inquiry since the title closer would be responsible for taking and transmitting the checks to be issued for the loan payoff. Unfortunately, Citibank and United contend that there was no title closer present. The representative from United was there merely to take and notarize signatures and collect documents. There was no “title closer” present. It is uncontroverted that the United representative was not selected or provided by the claimants.
In spite of the fact that Citibank is not liable to the claimants for the return of the $5,390, there are several problems with the Citibank documents. The equity source account agreement and disclosure at paragraph 19, “Governing Law,” indicates the agreement will be governed by New York State law while the equity source account master form mortgage at paragraph 23, “Choice of Law,” states “This Mortgage will be governed by . . . the laws of the State of California, regardless of the state in which You or Borrower resides.” Is this a mistake or is Citibank deliberately and for its own benefit seeking to have the mortgage governed by the laws of a state other than New York? The answer is obvious. The mortgage is the document that creates a lien on the borrowers’ real property located in New York, yet the borrowers are consenting to apply California law. Would they not be at a significant disadvantage should Citibank seek to enforce its rights under the mortgage? It is safe to conclude that there could be some legal significance to the borrowers that their loan is subject to California law and not New York law. Perhaps this is something an attorney might call to the *782 borrowers’ attention? But a home equity line of credit loan is a simple transaction and you do not need the expertise of an attorney.
The form labeled “Equity Source Account Individual Transaction Mortgage” informs the borrowers that “ ‘[rnjortgage’ means all the terms, covenants and conditions in these pages as well as those terms and conditions contained in the equity source account master form mortgage recorded in the Office of the County Clerk of Richmond on 03/31/1997 ... a copy of which has been furnished to Borrower.” Attached thereto and emblazoned with the notation “Borrower’s Copy” is the equity source account master form mortgage allegedly recorded on March 31, 1997. There is only one problem: the form bears the notation on all of its five pages “Revised 09/17/2003.” This is a major cause for concern. The mortgage attached to the claimants’ papers was drafted 6V2 years after it was recorded. Either the borrowers did not receive a copy of the mortgage that was recorded and to which they are subject or the individual transaction mortgage is referring to the wrong document. But a home equity line of credit loan is a simple transaction and you do not need the expertise of an attorney.
The Citibank documents also suffer from the same infirmities as those of MCU in that the forms state that there is no prepayment penalty but provide for an early closure release fee (Equity Source Account Agreement and Disclosure, at 1, 1i 5 [e]; Note, at 1,11 7) in the event the credit line is closed within the first 36 months. There does not appear to be an equivalent paragraph in the mortgage documents in regard to either there being no prepayment penalty or an early closure fee. Although Citibank does not seek to be reimbursed for the lender’s portion of the mortgage tax, the settlement or closing fee, the document preparation fee and overnight/postage fees, all the other charges are to be reimbursed. The borrowers are required to repay their share of the mortgage tax, recording charges, appraisal, credit report and flood certification fees. As stated above, no matter what the lender seeks to label this, it is a prepayment penalty. Since the document was drafted by Citibank, any ambiguous term must be presumed against Citibank. Citibank cannot seek to recover these charges should the borrowers cancel the line of credit in less than three years. But a home equity line of credit loan is a simple transaction and you do not need an attorney.
Although Citibank apparently had less closing costs than MCU, it could have saved the borrowers a substantial amount *783 of money by taking the MCU mortgage by assignment and. then consolidating, extending and modifying that agreement so that the mortgage tax would only be paid on the $15,000 of new money. There is no indication in the record if this option was available to the borrowers. The terms of the MCU mortgage documents did not prohibit an assignment. But a home equity line of credit loan is a simple transaction and you do not need an attorney.
The court cannot conclude that Citibank is responsible for the refund of the closing costs paid from the borrowers’ funds to MCU at closing. Citibank paid the amount demanded by MCU. To not pay that amount would jeopardize the priority of its loan, since if the MCU mortgage was not fully paid, MCU could refrain from issuing a satisfaction of mortgage.
C. Defendant United
Defendant United Land Services attended the closing on behalf of Citibank. Its witness stated that her function at the closing was to get proper identification from the borrowers, witness signatures on the documents prepared and provided by Citibank, and transmit the documents back to Citibank, along with any instructions on how to disburse the mortgage/equity source account funds.
The payoff check to MCU was issued on October 24, 2005 in the amount of $183,746.83 from an account bearing the name “United Land Services Corp. Settlement Account.” What kind of funds were these? The money is not a bank check. It is not a certified check. It is not an attorney’s trust account check. It is not from an escrow or special account. It is not even issued on an account at Citibank. There is no evidence that the money in that account is traceable to the Citibank loan. There does not appear to be any disclosure from either United or Citibank of the fact that the check was to be issued from United’s settlement account. Nor is there any disclosure of the relationship between United and Citibank. The borrowers would reasonably believe that they are to be receiving funds from Citibank, an internationally recognized financial institution, yet the record appears to be otherwise. What would the claimants’ obligation to MCU be if the United check was dishonored? Would there be any recourse against Citibank? But a home equity line of credit loan is a simple transaction and you do not need the expertise of an attorney.
An issue exists as to whether or not United, at the closing, or Citibank, when it processed the documents postclosing, upon *784 learning that the borrowers were questioning the amount of the payoff to MCU, had an obligation to confirm the payoff figure with MCU. At one time at closings when an existing mortgage loan was being paid off a representative of the title company would call the current mortgagee to confirm the payoff figures. If that had been done here, perhaps MCU would have waived all or some of the “early closure fee.” But since there was no attorney at the closing representing the interests of any of the participants, there was no one to conduct an inquiry. Even if the claimants elected not to be represented by counsel, an attorney at the closing for either of the defendants might have had an ethical obligation to conduct an inquiry on behalf of the claimants since it would be in the interest of all the parties not to have any open issues that could lead to postclosing problems. But a home equity line of credit loan is a simple transaction and you do not need the expertise of an attorney.
Citibank provided the claimants with a document entitled “Closing Instructions.” It states that: “All Lien (L) payoff checks secured by this property will be sent via overnight mail by the Title Company directly to the creditor.” The account payoff authorization form lists MCU as a payee with an (L). Neither document states that the check will be drawn on an account maintained by United. In fact, examination of the closing instruction form would lead to the conclusion that payment would be in one of the forms listed on that document; that is, direct deposit into a Citibank account, an official Citibank check or a wire transfer to be carried out by United. The disclosure given claimants does not state that the wire is to be from a United account.
It is also confusing that the documents indicate payoff checks will be mailed by the “Title Company.” The term “title company” usually refers to a business entity that issues title insurance (Insurance Law § 6401) although there is no prohibition on an entity using that term for its name when it engages in title abstract and similar real property related services. United Land Services Corp. is not a “title company” as understood in common parlance since it does not issue title insurance. There is also no evidence that it qualifies as a “title company” under federal law either. “[T]he term ‘title company’ means any institution which is qualified to issue title insurance, directly or through its agents, and also refers to any duly authorized agent of a title company” (12 USC § 2602 [4]). There is no evidence that United fits this definition either since there is no *785 disclosure of what exactly is its function other than to collect documents and take signatures at the closing. According to the closing papers, there was no title insurance issued at this closing. One of the documents signed at the closing is designated “BORROWER’S LIMITED TITLE AGREEMENT.” This form states: “In consideration of the Lien Protection Insurance Carrier (‘Carrier’) issuing lien protection insurance insuring your mortgage for the purpose of enabling the financing, Carrier’s reliance upon these agreements, I/We agree as follows: . . . .” No carrier is disclosed in either this or any other document signed by the claimants at closing. Claimants were not charged a mortgage insurance premium for insuring the priority of Citibank’s loan. Who the “Carrier” is and who is being insured are not set forth in this document. What is the legal effect of this form must be questioned. But a home equity line of credit loan is a simple transaction and you do not need the expertise of an attorney.
Although United may not be responsible to refund the $5,390 to the claimants, it cannot be concluded that United acted properly at the closing. In fact, United did not comply with MCU’s payoff instructions. The MCU payoff letter required that MCU be called to confirm the payoff figures. There was testimony that this was not done by the United representative. The MCU letter required separate checks to be issued for the loan payoff and for the reimbursement of closing costs. This too was not done. The failure of United to issue separate checks placed the claimants in jeopardy. Since claimants disputed the early closing figure, by placing the monies in one check, the claimants were being required to not only pay off the mortgage, which they agreed to do so, but also to pay a sum they disputed. Claimants were prejudiced by this procedure since they were prevented from receiving a release of the mortgage from MCU by paying only the principal and interest due while at the same time disputing the need to pay the early closure fee. But a home equity line of credit loan is a simple transaction and you do not need the expertise of an attorney.
Review of United’s role at the closing leads to the conclusion that United has no liability in regard to the payoff of the MCU mortgage even though United did not follow the MCU instructions. United was merely the conduit for ensuring that the funds were received by MCU after the closing.
D. General Business Law § 349
General Business Law § 349 provides: “(a) Deceptive acts or practices in the conduct of any business, trade or commerce *786 or in the furnishing of any service in this state are hereby declared unlawful.” Since this is a small claims action, the claimants’ complaint is merely a general statement of why relief is being sought and not a formalistic assertion of legal principles. This requires the court to analyze the facts of each case as presented rather than as pleaded so as to grant the “substantial justice” mandated by the statute (CCA 1804). To have a “deceptive practice” there must be a consumer-oriented transaction, the alleged act must be misleading in a material way and the consumer must suffer an injury (Stutman v Chemical Bank, 95 NY2d 24 [2000]).
There is no question that the practices of these defendants, which are apparently reflective of the standard operating procedures of entities engaged in the home equity line of credit loan business, amount to deceptive practices under the General Business Law and caused injury to the claimants.
1. Failure to Advise Borrowers of a Right to Counsel
There is no evidence that either MCU in 2004 or Citibank in 2005 informed the claimants as borrowers that they had a right to counsel and that the documents they were signing had serious legal implications — such as losing their home through a foreclosure action as well as having a monetary judgment entered against them. There is no evidence that either lender delivered to claimants the disclosure required by federal law (15 USC § 1637a [a] [5]). With all of the documents being signed prior to and at closing, it would seem that at a minimum a disclosure in this regard should have been made and that the claimants should have had to affirmatively waive the right to have counsel of their own present. Too often this court has heard in similar cases that unrepresented litigants believed counsel for the lender or the title company was present to protect their interests as borrowers. Although a prevalent conception, it is a misconception. At times during a closing, the interests of the borrowers, the lender and the title company may overlap, but these participants all have different concerns and different obligations. More importantly, when a dispute or a problem arises, who, if anyone, is representing each party’s interest? That is why traditionally in New York each party has its own counsel. Citibank has apparently solved the problem by not having any lawyers present at the closing. Under this situation, no one has counsel, so the parties are all at an equal disadvantage if they leave the closing with unresolved issues. But is this an accurate conclusion? Surely Citibank and United both *787 have attorneys readily available to protect their interests should an issue arise. The fact that the borrower can obtain counsel during the three-day rescission period does not remedy the blatant defect caused by the borrowers’ failure to have independent counsel at closing and not being advised that they should have obtained counsel prior to closing. It should be pointed out that the right-to-cancel form does not advise the parties to take the closing documents and have them reviewed by counsel. The fact that the lenders do not advise borrowers to obtain legal counsel is a deceptive practice.
Perhaps it is time for the New York State Legislature to require that a disclosure be executed at all closings when real property is being used to secure a loan which would inform the borrowers that they have a right to counsel.
2. No Prepayment Penalty Clause and Charging an Early Closing Fee
As pointed out above, both MCU and Citibank prepared documents that informed the borrowers that there was no “prepayment penalty” if the mortgage was paid in full before its due date. Yet both MCU and Citibank had clauses in their documents that required the borrowers to pay an early closure fee if the credit line loan was paid in full and cancelled within 36 months of the making of the loan. These paragraphs are ambiguous and contradictory. The documents are confusing at best and constitute a deceptive practice under the statute.
3. Failure to Disclose Relationships
Both MCU and Citibank had a third party attend their respective closing and serve as either a settlement agent or signature taker. Both lenders indicated in their individual statements disclosing closing costs that a settlement fee was being charged. MCU sought to have this fee reimbursed as part of its early closure fee while Citibank did not. Since the borrowers did not select the settlement agent and apparently were not even given that option, both lenders had an obligation to disclose their relationship with Settlement Corp. (MCU) and United Land Services (Citibank). The failure to disclose this relationship amounts to a deceptive practice.
United engaged in a deceptive practice in this regard as well; however, its deceptive practice is one of omission. There is no indication that United disclosed to the borrowers the function of its representative at the closing. No one explained to the borrowers that their changing the payoff figure was meaningless since Citibank would issue a check in the amount MCU claimed *788 was due and not the figure the claimants were asserting was proper. United’s representative testified she did not change the payoff figure, did not authorize it, did not call MCU to confirm it and did not even realize the figure had been changed. If she was in fact there to take the signatures and make certain the papers were properly signed, how did she not see the change in the payoff figure even if she did not do it herself? Was that not her function at the closing? The silence of United’s representative when this took place and her failure to clarify her role at the closing amounted to a deceptive practice.
4. Document Discrepancies
As noted above, Citibank has several material errors in its closing papers. The most serious is that the equity source agreement and the mortgage are to be interpreted under the laws of different states, New York and California, respectively. The other significant error is that the individual transaction mortgage refers to a 1997 master mortgage and the master mortgage produced is from 2003 so it cannot be the document referred to in the individual transaction mortgage. It should also be pointed out that both MCU and Citibank claim to have given the borrowers duplicate copies of the closing documents, including the mortgage. Neither lender’s mortgage contains a description of the property. How did the mortgage get recorded? These documentary errors amount to a deceptive practice.
Conclusion
Claimants are entitled to the following judgments:
1. Against MCU in the amount of $462.50 for the lender’s portion of the mortgage tax in August 2004. MCU is precluded from collecting this charge as a reimbursement for early closure of the credit line by statute. This judgment is with interest from October 24, 2005, the date the payoff check was issued.
2. Against MCU in the amount of $4,927.50 as a refund of the closing costs MCU wrongfully collected for early closure of the credit line account. The credit line agreement and mortgage both prohibited any prepayment penalty being assessed. Labeling the payment a reimbursement did not transform the essential nature of these funds from a penalty. It is a penalty and cannot be collected. This judgment is with interest from October 24, 2005 the date the payoff check was issued, costs and disbursements.
3. Against MCU in the amount of $50 for engaging in deceptive business practices in violation of General Business Law *789 § 349. General Business Law § 349 (h) permits the assessment of actual damages or $50 whichever is greater when such a violation has occurred. Although claimants could also be awarded the above indicated $462.50 and $4,927.50 as damages for MCU’s deceptive practices, the court does not intend to make more than one award in those amounts even though justified on several different grounds. The award of $50 is for the entire panoply of deceptive practices engaged in by MCU. This judgment is with interest from the date of judgment.
4. Against Citibank in the amount of $50 for engaging in deceptive business practices in violation of General Business Law § 349. Citibank is not responsible for the refunding of the MCU closing costs. However, as pointed out above, it too engaged in deceptive practices in regard to the closing of October 2005. This judgment is with interest from the date of judgment.
5. Against United in the amount of $50 for engaging in deceptive business practices in violation of General Business Law § 349. United is not responsible for the refunding of the MCU closing costs. United did engage in several deceptive activities at the closing. This judgment is with interest from the date of judgment.
Summary
Had claimants been represented by counsel, this litigation would probably not be before the court. However, claimants’ failure to have their own attorney present at the closing did not give the defendants carte blanche to take advantage of the claimants.
As Benjamin Franklin pointed out in Poor Richard’s Almanac: “A little neglect may breed mischief: for want of a nail the shoe was lost; for want of a shoe the horse was lost; and for want of a horse the rider was lost.”
The court would hope that the mischief being bred by not having lawyers at “simple” closings does not lead to the “riderless horse” of more egregious harm being suffered by the public.

. Act IV scene 2, line 86.

. The role of Gold Hat was played by Alfonso Bedoya.

. Juliet in Shakespeare’s “Romeo and Juliet,” act II, scene 2, line 43.